NEWCOMB, Appellant, v. NEW YORK CENTRAL & HUDSON RIVER RAILROAD COMPANY.

Division One, June 28, 1902.

**Sole Negligence of Defendant: INSTRUCTION: CONCURRENT CAUSES.**

The jury were told, in a suit against a railroad by a passenger injured in jumping from a train which he had by mistake mounted on invitation of the porter, that, "before plaintiff can recover in this case, it must appear to your satisfaction from the evidence, that his injury was caused solely by the negligence of the defendant, without any fault, neglect, or want of ordinary care and prudence on his part." *Held*, that this instruction is erroneous in that it limits defendant's liability to the sole negligence of defendant. A defendant is liable if his negligence concurred with that of another, or with the act of God, or with an inanimate cause, and became a part of the direct and proximate cause although not the sole cause of the injury. Hence, where there were two passenger trains at the same station, both bound for New York, and as one of them was moving out, plaintiff, who had gotten off his train to get a lunch, asked the porter if that was the train to New York, and the reply was, "Yes, jump on," and after doing so he discovered the mistake and attempted to jump off, and in doing so struck a mass of grease, his right to recover for the injury received can not be limited to defendant's sole negligence in permitting the grease to

accumulate, but if his injury resulted from this negligence concurring with any negligence of which the porter may have been guilty in inviting him to mount the wrong train, both would be liable for his damages.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris,* Judge.

REVERSED AND REMANDED.

*Thomas T. Fauntleroy* for appellant.

(1) It is the duty of a carrier of passengers to use ordinary care to have its depot platforms in a reasonably safe condition for the use for which they are intended. It was error to exclude from the jury the issue of negligence in that particular in this case. Fullerton v. Fordyce, 121 Mo. 1; Waller v. Railroad, 59 Mo. App. 410; Railway v. Wortham, 73 Tex. 25. (2) It is part of the duty of a carrier of passengers to use ordinary care to regulate and manage the approaches to its cars at a large terminal station, so as to give reasonable notice of the location and departure of its respective trains, and especially where several trains are to leave by different routes, about the same time, for the same destination; and the trial court erred in excluding from the jury the issue of defendant's negligence in that particular by the third and thirteenth instructions given. A carrier is bound to take reasonable care at a terminal station to afford all necessary facilities to its passengers in entering and leaving its cars, and a breach of that duty is negligence and is actionable if injury directly results therefrom, just as is negligent management of its cars while the passenger is in transit. Eichorn v. Railroad, 130 Mo. 575; McGee v. Railroad, 92 Mo. 208; State v. Blunt, 110 Mo. 392; Railroad v. Brown, 78 Tex. 397. (3) It was error in the trial court (after first narrowing the issues to the single one of want of care in defendant's permitting grease to remain on the "incline," or

sloping platform, where plaintiff slid under the cars) to tell the jury that plaintiff could not recover at all unless his injury "was caused solely by the negligence of defendant." A party is liable for a negligent act if his want of care directly contributes to the injury caused by said act. It is not requisite that the negligent act be the sole cause. Brash v. St. Louis, 161 Mo. 433; Ring v. Cohoes, 77 N. Y. 83; McDermott v. Railroad, 87 Mo. 285; Scott v. Shepard, 2 Wm. Bl. 892 (the celebrated squib case); Lynch v. Nurdin, 1 Ad. & Ell. (N. S.) 29; Burrows v. Marsh Gas Co., 5 Exch. (L. R.) 67; Webster v. Railroad, 38 N. Y. 260; Lake v. Milliken, 62 Me. 240; Weick v. Lander, 75 Ill. 93; Lane v. Atlantic Works, 111 Mass. 140; Griggs v. Fleckenstein, 14 Minn. 81; Slater v. Mersereau, 64 N. Y. 138. (4) The trial court erred in telling the jury that "any fault, neglect, or want of ordinary care and prudence" on the part of plaintiff, directly contributing to his injury, would defeat his recovery. He was only bound to use ordinary care. The rule given by the court in the third instruction required plaintiff to be free of "any fault," as well as of any "want of ordinary care," in the premises. This was error. Bischoff v. Railroad, 121 Mo. 216; Dickson v. Railroad, 124 Mo. 140. (5) It was competent for plaintiff to show, by the testimony which the court excluded, that a similar condition of the platform in question had been observed by the witnesses at various times within six months before the date of plaintiff's injury. It was error to exclude that testimony. Hoover v. Railroad, 16 S. W. 480; District v. Armes, 107 U. S. 519; Golden v. Clinton, 54 Mo. App. 100; Chase v. Railroad, 38 N. Y. 954 (affirmed, 133 N. Y. 619).

*Everett W. Pattison* for respondent.

(1) The injury did not result from the causes specified in the petition, or any of them. Henry v. Railroad, 76 Mo.

293; Chitty v. Railroad, 148 Mo. 64; Neville v. St. Louis Merch. Bridge, 158 Mo. 293. (2) The duty which defendant owed plaintiff was to use ordinary care to furnish a station which was safe and proper for passengers going to or coming from the trains in the ordinary manner, and for getting on and off the trains in an ordinary manner. Kelly v. Railroad, 112 N. Y. 443; Ainley v. Railroad, 42 Hun 206; Lafflin v. Railroad, 106 N. Y. 139; Thompson on Carriers, p. 104 n.; Hiatt v. Railroad, 96 Iowa 169; Flint & P. M. R. Co. v. Stark, 38 Mich. 714. (3) Defendant was under no obligation to furnish to plaintiff a safe place to jump to from a moving train. Railroad v. Scates, 90 Ill. 586; Burrows v. Railroad, 63 N. Y. 556; Solomon v. Railroad, 103 N. Y. 444. (4) The first and last instructions properly confined the jury to the question of grease or oil on the platform. The same theory is adopted by appellant in his instruction numbered 2. Thorpe v. Railroad, 89 Mo. 666; Christian v. Ins. Co., 143 Mo. 467; Phelps v. Salisbury, 161 Mo. 14; Sowden v. Kessler, 76 Mo. App. 584; Putnam v. Railroad, 55 N. Y. 119; DeMahy v. Railroad, 45 La. Ann. (2d part) 1329; Lewis v. Railroad, 54 Mich. 55; Bishop on Non-Contract Law, sec. 42. (5) The criticisms on instructions 3, 4 and 7 are without merit. Yarnall v. Railroad, 113 Mo. 580; Plefka v. Knapp, 145 Mo. 321; Carvin v. St. Louis, 151 Mo. 345; Bartley v. Railroad, 148 Mo. 140; Railroad v. Jones, 95 U. S. 442; Jones v. Railroad, 4 App. Dec. 172. (6) The court below committed no error in its rulings on the evidence. Goble v. Kansas City, 148 Mo. 470. (7) Under the pleadings and plaintiff's own testimony, the court below might properly have taken the case from the jury. Chitty v. Railroad, 148 Mo. 64; Henry v. Railroad, 76 Mo. 288; Jones v. Brownlee, 161 Mo. 258.

MARSHALL, J.—On August 7, 1897, the plaintiff purchased a ticket at St. Louis for transportation to New

York, over the Wabash, Michigan Central, and New York Central railroads. At 6:30 p. m. on Sunday, August 8th, he arrived at Buffalo, New York, over the Michigan Central railroad, where a stop of twenty minutes was provided for supper. From Buffalo to New York the plaintiff was to go over the New York Central railroad. The defendant's depot at Buffalo, into which the Michigan Central train came and out of which the New York Central train was to go, fronts north on the south side of Exchange street. Next to the street is the ticket office, waiting-room, baggage-room and restaurant. In the rear thereof, to the south, are tracks numbered one to six from north to south. There is a platform for passengers to use running parallel with the track between the building and track number one, and similar platforms between tracks two and three and four and five. In other words, the tracks are constructed in pairs, with platforms between each pair for passengers to use in reaching the trains on the several tracks. There are three cross-overs or runways across the tracks inside of the station. The first is one hundred feet east of the west end of the station. The second is four hundred and fifty feet east of the west end of the station, and directly opposite the waiting-room. The third is five hundred and fifty feet east of the west end of the station, and is on a prolongation of the exit from the station to Exchange street between the waiting-room and the restaurant. The platforms were elevated about seven or eight inches above the rails. These cross-overs are made to enable passengers to conveniently cross over the tracks and also so that the trainmen can run the baggage trucks across the tracks to the several trains. To reach the cross-overs there are inclines in the platform. They are fifteen feet and three inches long and the rise is less than eight inches, so that the incline is about half an inch to the foot. The incline is in the line of the platform, that is, from west to east, the crossways extend from north to south. The whole construc-

tion is what is called by the witnesses "the standard plan," adopted by the engineers of the New York Central railroad, and in use at all stations along its line.

The Michigan Central train, upon which the plaintiff arrived in Buffalo, entered the station from the west, upon track number six, the track furthest from the station buildings. Learning that he had twenty minutes for supper, the plaintiff left the sleeper, in which he had been traveling, and without noting the name of the sleeper—although it was upon his sleeping-car ticket—he went across one of the three cross-overs, he does not know which, to the restaurant. After eating his supper, he started back across the tracks, by way of one of the three cross-overs, to his sleeper. In doing so he met a friend from St. Louis, Mr. Knox, and they walked along together. Some one stopped Mr. Knox and the plaintiff proceeded alone. He crossed the platform between the restaurant and track number one; he crossed the first pair of tracks, numbered one and two; he crossed the platform between tracks two and three; he crossed the next pair of tracks, numbered three and four, and when he reached the platform between track number four and track number five he turned west and walked along the platform. There was a train standing on track number four (which was the West Shore train) and a train standing on track number five (which was the New York Central train to which his sleeper had been transferred from the Michigan Central train). It was then 6:45 p. m., the regular schedule leaving time of the West Shore train. The New York Central train was not to leave until 6:50 p. m. While walking west along said platform, with the West Shore train on his right and the New York Central train to his left, the two trains being separated only by the platform, which was about fifteen feet wide—he noticed that the train on his right was moving. The porter of the sleeper attached to that train had left the platform and gotten on to the step of the sleeper. The plain-

tiff stepped up to the train and asked the porter of the sleeper if that was the train for New York. The porter replied, "Yes, sir; jump on." The plaintiff did so. This was at a point about fifty feet east of the west end of the station and about fifty feet west of the first or most westerly cross-over. Afer thus getting on the train the plaintiff noticed that it was not the same sleeper in which he had traveled to Buffalo, and so he said to the porter, "Did you say this was the New York train?" The porter replied, "How do you want to go," The plaintiff answered "I want to go by the New York Central." The porter said: "This is the West Shore; get off." It seems that both the West Shore and New York Central trains run from Buffalo to New York, but over different routes. But of this the plaintiff was ignorant. When the porter told the plaintiff to get off, the train was running slowly —from two to six miles an hour according to the various witnesses—the grade is heavy inside of the station towards the east and, hence, the trains can not run fast upon starting. By this time the sleeping-car on which the plaintiff was, had crossed the first and second cross-overs and was within about twenty feet of the third cross-over, which was nearly opposite the restaurant. That is, the train had traveled about five hundred and eighty feet from where the plaintiff boarded it. The plaintiff then got off of the train. He says he did so of his own volition and not because the porter told him to do so or because he was ordered to get off; that "it was a deliberate, voluntary act on his part; he took his time. He looked first on the north side of the train and saw there were tracks on that side; he then looked on the south side and calculated that was the safer side to jump on. Before jumping he took a glance on one side and then on the other." He then describes his manner of getting off and how he was injured as follows:

"Q. Did you get down on the bottom step? A. I do not think I did.

"Q. You don't think you got down on the bottom step? A. No, I am not positive; I went and took hold of that rail.

"Q. That is the hand-rail that is attached to the body of the car? A. Yes, sir; the hand-rail of the front car of those two cars, that inclosed this platform; and I got hold of that and got off the train—jumped off the train—and when I got off, of course, simultaneously, I let go of the rail, as one naturally would do.

"Q. You got hold of the hand-rail attached to the body of the front sleeper? A. Yes, sir.

"Q. Now, you say you do not think you got down on the bottom step; from what point did you jump? A. Why, I got down on the step, but I don't think I went to the bottom; I am not positive.

"Well, your best recollection is that it was not the bottom step? A. Yes, sir.

"Q. Is your memory perfectly clear in regard to letting go of the rails as you jumped? A. Yes, sir.

"Q. Did you look to see whether the place you were going to alight on was a reasonably safe one, and clear from obstructions? A. I took it to be the platform; I presumed it was a straight platform; I didn't see anything where I was going to jump.

"Q. You had walked across one of these runways, hadn't you? A. Yes, sir.

"Q. Twice? A. Yes, sir.

"Q. So you knew there were runways in the station, lower than the platform? A. Yes, but not very much lower.

"Q. Seven or eight inches lower, though? A. Yes, sir.

"Q. So you were familiar with that fact? A. Those inclines did not impress themselves particularly on me, when I walked across them.

"Q. But you knew they were there? A. I could not

have told you at that time, if it had not been for this accident, about these runways—the incline—how much incline there was.

"Q. You walked down from the platform on the incline, and up again? A. Yes, sir.

"Q. So that you did know they were there? A. Yes, sir; but I did not take any special notice.

"Q. Now, when you jumped, did you look at the place where you expected to alight; before jumping? A. Yes, sir; I looked at the platform; supposed it was a level, straight platform.

"Q. Your eyesight as that time was good? A. Fairly good, yes, sir.

"Q. Good enough? A. It is an ordinarily good eyesight.

"Q. And at that time the station was fairly well lighted? A. Yes, sir; fairly well.

"Q. The sun had not set? A. I think not; it might have been just about sunset.

"Q. Well, it was before seven o'clock? The sun was not entirely down, in any event? A. No, I don't think it was, but I am not positive.

"Q. But at all events, it was light enough for you to see? A. Yes, sir.

"Q. Did you notice the incline at all, before you jumped? A. No, sir.

"Q. Did you see any grease at the place where you expected to alight? A. No, sir; I wasn't looking for grease.

"Q. No, but if there had been this mass of grease there you would have seen it, wouldn't you? A. Why, if there had been a mass of grease, yes, sir, I think very likely I should have seen it; I was not looking for grease.

"Q. Were you not looking to see whether the place you

Vol. 169 mo—27

expected to alight on was reasonably safe for that purpose? A. Why, yes, that is the reason I took the platform instead of the track.

"Q. When you walked from the restaurant down to retake your train, did you notice any grease about the station? A. No, sir.

"Q. Have you any recollection about how far from the train the spot was that you chose to jump on? In other words, my mind is not clear; about how far from the car did you intend to jump? A. Why, I intended to jump on the platform, about two feet from the edge, or thereabouts. I didn't select any particular spot. I saw the platform and jumped on it.

"Q. You did not notice that at that point it was one of the inclines? A. No, sir.

"Q. You say about two feet. Do you mean two feet from the edge of the platform or two feet from the side of the car? A. Well, about two feet from the edge of the platform.

"Q. When your foot struck the platform, what happened? A. It slipped.

"Q. Do you know whether both feet struck together, or whether one struck first? A. I do not know that.

"Q. But as you struck the platform, your feet went from under you? A. Yes, sir; and I was run over in the twinkling of an eye.

"Q. You do not know yourself, really, what happened from the time you struck until the accident occurred? A. No, from the time I struck until the running over of my leg by the wheel; it was an awful shock.

"Q. Do you know whether or not you were down on the track at any time? A. I was down on the track, because I was lifted up; I know that; lifted up, and placed higher up on the platform by somebody that came to my rescue; or

came to relieve me. I recollect that distinctly; I recollect a sensation of an incline in my back; I recollect that distinctly.

"Q. Then you were down on the part where the rail is, and some people came and lifted you up on the platform? A. How far down I don't know, but they lifted me only a small distance; I recollect that sensation.

"Q. That was the only place that was lower than any other. The part of the station that the tracks were on was the only part lower than the platforms, except the runways? A. Certainly, one part of the incline would be lower than a higher part of the same incline. Where I was exactly, I could not tell; whether I was part on the incline and part on the track I can not tell. How much I was on the incline I could not tell, for at that time I was shocked.

"Q. Have you any recollection of being down inside the rail? A. No, sir.

"Q. You don't know whether, when they lifted you up, they lifted you up from where the rail is, or from a lower part of the incline to a higher part? A. I do not know.

"Q. Do you recollect whether you rolled over or not, Mr. Newcomb? A. I do not recollect of any rolling over. That was the injury, here (pointing to his foot). If I had rolled over, it is to be presumed I would have had other serious injuries; it would look so to me.

"Q. As I understand you, when the men came and lifted you up, you were conscious of being on an incline, where your head was higher than your feet? A. Yes, sir."

In consequence of the injuries the plaintiff's left leg had to be amputated.

The petition does not state the case as it is here stated, but simply states that while the plaintiff was endeavoring to find and get upon the train, by direction of one of the defendant's employees, he "stepped, *from a car on said West Shore line*" [the italicised words were added during the trial] "upon one of the platforms in said station on his way to take the car

on which he was to ride over defendant's main line to New York, his foot slipped upon the grease or other slippery material upon said platform, thereby contributing to produce his said misfortune." The petition charges four acts of negligence on the part of the defendant as follows:

*First,* that defendant did not use ordinary care to arrange, manage and construct its station at Buffalo so as to afford reasonable facilities for the use of passengers, and failed to take reasonable precautions in the construction and maintenance of the station to avoid injury to passengers.

*Second,* that defendant did not use ordinary care to keep the platforms and approaches to its cars in a reasonably safe condition for use by passengers wishing to step upon or off its train.

*Third,* that defendant did not use reasonable care to keep the platform free of grease and other slippery material, in consequence of which, when by direction of one of defendant's employees plaintiff stepped upon one of the platforms in the station on his way to take his car, his foot slipped upon such greasy or other slippery material.

*Fourth,* the defendant did not exercise reasonable care to make proper, suitable and reasonable arrangements for directing a passenger, in the position of plaintiff, where to go to take his train.

The answer is a general denial, an admission that the plaintiff was being transported from St. Louis to New York, and a plea of contributory negligence.

There was no evidence to support the first or second charges of negligence as to the construction and arrangement of the station, or the condition of the platforms and approaches in the station, and the trial court withdrew those from the jury by an instruction, and no serious complaint is made of this ruling by the plaintiff. The trial court also withdrew the fourth charge of negligence relating to there being no suitable arrangements in the station for directing passengers which

train to take, and the plaintiff assigns this as error. The trial court limited the case to the third ground alleged, to-wit, the grease on the platform. It is conceded that there was a conflict in the evidence as to whether there was or was not grease upon the platform, and, therefore, the plaintiff was entitled to go to the jury.

The court gave all the instructions asked by the plaintiff. Those instructions predicate a right to recover solely upon the ground that the defendant was negligent in permitting grease to be upon the platform, which caused the plaintiff to fall when he got off the moving West Shore train; tell the jury that it was not necessarily negligence for the plaintiff to get off of a moving train; tell the jury that they are the judges of the credibility of the witnesses; define the meaning of ordinary care, and negligence, and contributory negligence, and fix the measure of damages.

For the defendant the court gave six instructions and then gave one instruction (No.13) of its own motion. Of these it is only necessary to set out in full the third which is as follows:

"3. The jury are instructed that the duty of exercising care was not limited to one of the parties to this suit, but that such duty devolved upon both? Each party, plaintiff and defendant, was under obligation to exercise such care and vigilance in the particulars mentioned in these instructions as an ordinarily prudent person would exercise under like circumstances. Therefore, before plaintiff can recover in this case it must appear to your satisfaction from the evidence, that his injury was caused solely by the negligence of defendant, without any fault, neglect, or want of ordinary care and prudence on his part. If there was mutual negligence, plaintiff is not entitled to recover. Therefore, even if you believe that the defendant was guilty of negligence, yet if you further believe from the evidence that plaintiff was also guilty of negligence in jumping from a train while it was in motion,

and that such negligence directly contributed to his injury, your verdict must be for the defendant."

The jury returned a verdict for the defendant, and after proper steps the plaintiff appealed.

## I.

The third instruction given for the defendant is assigned as error, in this, that it instructed the jury: "Therefore, before plaintiff can recover in this case, it must appear to your satisfaction from the evidence, that his injury was caused *solely* by the negligence of the defendant, without any fault, neglect, or want of ordinary care and prudence on his part." The vice claimed to be present in this instruction is that it limits the defendant's liability to the *sole* negligence of the defendant, and that it precludes the plaintiff from recovering if he was guilty of "any fault, neglect or want of ordinary care and prudence," it being contended that the defendant is liable even if its negligence was not the *sole* cause of the accident, while the plaintiff could recover if his fault, neglect or want of ordinary care was only slight and remote.

A defendant may be liable even if the accident was not caused by his *sole* negligence. He is liable if his negligence concurred with that of another, or with the act of God or with an inanimate cause, and became a part of the direct and proximate cause although not the sole cause.

Thompson on Negligence, volume 1, section 75, thus states the rule: "If the concurrent or successive negligence of two persons, combined together, result in an injury to a third person, he may recover damages of either or both, and neither can interpose the defense that the prior or concurrent negligence of the other contributed to the injury. Thus, A leaves his horse and cart standing in the street, without any person to watch them, and a passer-by strikes the horse, in consequence of which damage ensues. A is answerable for

such damage. An omnibus overturns, precipitating a passenger into the lock of a canal. A third person, for whose acts the proprietor of the omnibus is not responsible, lets the water into the canal, in consequence of which the passenger is drowned. The proprietor of the omnibus must pay damages for the death of the passenger. This is also illustrated by that numerous class of cases where travelers are injured by reason of defects in highways. As elsewhere seen, the traveler may maintain an action either against a municipal corporation, or against the private wrongdoer who caused the defect; and the municipal corporation, if compelled to pay damages, may maintain an action against the private wrongdoer for reimbursement. Consequently, a defendant, whose negligence was a procuring cause of an injury, can not excuse his negligence by setting up the concurring negligence of a third person. For example, where A negligently placed on a sidewalk an iron post, used as a barber's pole, and B negligently backed his wagon against it, whereby it was knocked over, striking C and injuring him, it was held that the negligence of A did not prevent C from recovering damages of B. So, if through the negligence of a railway company, the employee of another company receives an injury, the fact that the negligence of other employees of the latter company, who were fellow-servants with the injured employee, also contributed to the injury, does not relieve the former company from liability."

In respect to the concurrent negligence of a carrier and a third person, the same author in volume 3, section 2779, says: "But it does not at all follow from the foregoing that the carrier will be exonerated in every case where the negligence of a third person concurs with his negligence in producing the hurt to the passenger. It is elsewhere shown that where an injury proceeds from the concurring negligence of two different persons under such circumstances that the negligence of either is to be deemed an efficient cause of the injury the

person injured has an action for damages against either or against both. This rule is of application in the relation of carrier and passenger. Thus, where the evidence tended to show that the conductor of a street railway car had ordered a boy to stand on the front platform, and that, while the boy was so standing, another passenger jostled him from the car, whereby he received a fatal hurt, and there was no evidence that he would have received the hurt but for the intervening wrong of the passenger, the company was nevertheless held liable—the court saying: 'It is no justification for the defendant that another party, a stranger was also in the wrong. It is necessarily a part of this doctrine, that a railroad company can not defend against an action by its own passenger for a negligent injury received by him while on the vehicle of the defendant, by setting up that another railroad company was guilty of greater negligence, if the defendant company might have averted the injury to the plaintiff by the exercise of that measure of care which the policy of the law puts upon it. Nor need it be said that where a passenger on a railway train is injured by a collision between such train and the train of another company, at a point where the two lines cross each other at a grade, and brings an action against his own carrier, the defendant can not defend against its own liability, on the ground that the other company was also negligent; if the defendant company was negligent, that is enough, and it must pay damages.' In the application of the doctrine of the foregoing text, it has been well held that, in the case of a collision between a street car and a locomotive on a steam railway, at the intersection of the two railways, whereby a passenger on the horse car is injured, if he brings his action against both companies, charging concurrent negligence, the burden will be upon the horse-car company to show proper care; because the fact of the injury to its passenger creates a presumption of negligence on its part, and the burden will be upon the plaintiff to show

negligence upon the part of the steam-railway company, because that company was a stranger to him."

Bishop, on Non-Contract Law, section 39, says: "When the injury proceeds from two causes operating together, the party putting in motion one of them is liable the same as though it was the sole cause. This is one form of a universal principle in the law, that he who contributes to a wrong, either civil or criminal, is answerable as doer. And it is immaterial to this proposition whether that to which he contributes is the volition of a responsible person, or of an irresponsible one, or whether it is a mere inanimate force, or a force in nature, or a disease."

Again, the same author in treating of negligence combining with other causes, in sections 450, 451 and 452, lays down the rule as follows:

"Sec. 450. The leading doctrine governing this sub-title has already been stated; namely, that where two or more causes operate together, not where, after one has begun, an independent one comes in to produce its own different result—the party putting any one in motion is responsible for the entire consequence the same as though it were the sole cause. And it is not necessary that the beginning of their operation should be simultaneous.

"Sec. 451. It is no defense by one sued for negligence that, though his negligence contributed to the injury, another's contributed also. For example, in a case of collision between stage-coaches, if the driver of the defendant's coach was wanting in skill and prudence, no recklessness of the other driver will exempt him from liability to another. So, in a suit against a railroad for setting fire to the plaintiff's elevator by sparks carelessly thrown from the locomotive, if it appears that they fell, not upon the elevator, but upon a third person's building which was consumed, it will not avail the defendant that the fire was communicated thence through the carelessness of the third person. The reason of this has

already been stated, and it has been shown that a contrary doctrine, incautiously held in Massachusetts and one or two other States, is utterly without support either in general adjudication or in just legal principles.

"Sec. 452. The same rule applies also when some irresponsible force or inanimate thing co-operates with the defendant's negligence to produce the harm. Thus, where a city had carelessly left an excavation in the street, and a person attempting to avoid the threatened kick of a mule fell into it and was injured, the city was held to be liable."

The illustration last given of the defect in the street and the kicking mule is founded upon the case of Bassett v. St. Joseph, 53 Mo. 290. Other illustrations of such combination of causes are shown in the cases of Brennan v. St. Louis, 92 Mo. 482, where a ditch in a street combined with the accidental fall of a third person against a child who was pushing a baby buggy, thereby causing them to fall into a ditch, and Vogelgesang v. St. Louis, 139 Mo. 131, where a slight depression at the end of a bridge in a street, combined with the steam emitted from an engine under the bridge to cause a gentle team to run away, throw the plaintiff out of the wagon and injure him.

Bishop on Non-Contract Law, section 518, gives the reason underlying the rule as follows:

"Sec. 518. The fundamental doctrine is, that, since the habitations and life of man are in the midst of constantly active forces in nature, and his necessities compel him to be perpetually active also, it is not possible in jurisprudence, nor would it be just, to limit one's responsibility for harm inflicted on another through his acts, to the particular injuries whereof those acts are the sole cause. Indeed, a sole cause is a thing seldom found in our complicated world. Nor would it be practicable, nor yet is it demanded by any principle of justice, to take into the account all the combining causes of an injury, and charge the author of each cause with simply

his proportion of the damage.   Therefore, the rule of the law is, that a person contributing to a tort, whether his fellow-contributors are men, natural or other forces, or things, is responsible for the whole the same as though he had done all without help.   The limit to this rule, in civil jurisprudence, is simply what is required by another rule; namely, that" the injured person is only entitled to one compensation.

In Brash v. St. Louis, 161 Mo. l. c. 437, the negligence of the city combined with the act of God.   The verdict against the city was sustained.   BRACE, J., said:   "The general doctrine on the question in issue on the instruction is thus stated in 1 Shearman & Redfield on Negligence (5 Ed.), sec. 39: 'It is universally agreed that, if the damage is caused by the concurring force of the defendant's negligence and some other force for which he is not responsible, including "the act of God," or superhuman force intervening, the defendant is nevertheless responsible, if his negligence is one of the proximate causes of the damage, within the definition already given. It is also agreed that, if the negligence of the defendant concurs with the other cause of the injury, in point of time and place, or otherwise so directly contributes to the plaintiff's damage that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable, notwithstanding he may not have anticipated the interference of the superior force, which, concurring with his own negligence, produced the damage.   But if the superior force would have produced the same damage, whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury.'   And this is the prevailing doctrine in this State.   [Wolf v. Am. Express Co., 43 Mo. 421; Read v. Railroad, 60 Mo. 199; Pruitt v. Railroad, 62 Mo. 527; Davis v. Railroad, 89 Mo. 340; Haney v. Kansas City, 94 Mo. 334; Am. Brew. Ass'n v. Talbot, 141 Mo. 674.] There is nothing in the rulings in Flori v. St. Louis, 69

Mo. 341, or Turner v. Haar, 114 Mo. 335, inconsistent with this doctrine."

  Shearman & Redfield on Negligence (5 Ed.), sec. 122, says: "Persons who co-operate in an act directly causing injury are jointly and severally liable for its consequences if they acted in concert, or united in causing a single injury, even though acting independently of each other."

  In Nagel v. Railroad, 75 Mo. l. c. 661, a railroad company was held liable for concurrent negligence in that it left a turntable unfastened, and children playing with it caused it to revolve and injure the plaintiff.

  In Payne v. Railroad, 129 Mo. l. c. 419, the converse of the proposition was presented. There the court instructed the jury, at the request of the plaintiff that, "it is not sufficient that the jury may believe from the evidence that the plaintiff was simply guilty of negligence, but that the negligence of the plaintiff, and not that of the defendant, must be the proximate or immediate cause of the injury, to excuse the defendant from liability." Speaking of this instruction this court, per MACFARLANE, J., said: "The jury may as well have been told that to defeat a recovery on the plea of contributory negligence, it was necessary to find that the negligence of plaintiff was the *sole* proximate cause of the injury. The instruction ignored entirely concurring or contributory negligence of both parties which is one essential element of contributory negligence. There are no degrees which distinguish the negligence made necessary by the law to defeat a recovery. And negligence which is proximate or a cause of the injury is sufficient. It does not matter that the concurring and co-operating negligence of defendant was negligence *per se,* such as the violation of an ordinance, as in this case, or statute law. The instruction is also misleading wherein it informs the jury that in order for the defendant to establish its plea of contributory negligence 'it is not sufficient that the jury may believe from the evidence that plain-

tiff was simply guilty of negligence,' and as qualified or explained, by what follows, does not correctly state the law. *The negligence to defeat a recovery must be a proximate cause for the injury, but need not be the sole proximate cause.*"

The reason for this rule as applied to the contributory negligence of the plaintiff is thus stated in 1 Shearman & Redf. on Neg. (5 Ed.), sec. 96: "It is not essential to this defense that the plaintiff's fault should have been, in any degree, the cause of the event by which he was injured. It is enough to defeat him, if the injury might have been avoided by his exercise of ordinary care. The question to be determined in every case is, not whether the plaintiff's negligence *caused,* but whether it *contributed* to the injury of which he complains."

Because the doctrine of concurrent negligence prevails in this State a defendant is liable notwithstanding his negligence was not the *sole* cause of the accident, and because the doctrine of comparative negligence does not obtain in this State (Hurt v. Railroad, 94 Mo. 1. c. 264; Hogan v. Railroad, 150 Mo. 1. c. 55) the contributory negligence of a plaintiff will defeat a recovery if it *directly* contributes to the accident (Oates v. Railroad, 168 Mo. 535), even though it is not the cause or sole cause of the accident, and even though such contributory negligence was only slight or remote.

The plaintiff contends that the defendant owned and operated the West Shore train as well as the New York Central train, and, hence, defendant is liable for the negligence of the agents and persons operating the West Shore train. On the other hand, the defendant contends that there is no substantial evidence in this record that the defendant so owned or operated the West Shore train, and, hence, it is not responsible for the negligence of the agents and persons operating the West Shore train. The plaintiff further contends that it was negligence for the porter of the sleeping-car on the West Shore train to tell the plaintiff that that was the New

York train and to invite him to get on it, and that such negligence was the primary cause of the accident and the grease on the platform was the secondary cause of the accident, and that combined they produced the direct and proximate cause, and that neither would have, probably, caused the accident if the other had not existed. The defendant, however, contends that it is in nowise liable for any negligence of the porter of the sleeping-car or of any agent or persons operating the West Shore train, because it is not shown that the defendant had anything to do with that road or train.

If the plaintiff's contention that the defendant owned and operated the West Shore train was supported by the evidence, then the plaintiff could not be heard to assign error as to the third instruction. For though it is not the law that a defendant is only liable where. his negligence is the *sole* cause of the accident, still that error in that instruction would not entitle the plaintiff to a reversal of this judgment, for the reason that there would be no evidence of any concurrent negligence in the case, and, therefore, the error in the instruction could not have prejudiced the plaintiff. But such contention is not supported by the evidence in this record. There is no substantial evidence that the defendant owned or operated the West Shore train. Therefore, the negligence of the operatives of that train in telling the plaintiff that it was the New York train and in inviting the plaintiff to get on that train, may have constituted negligence of such operatives, which concurred with the negligence of the defendant in permitting grease to accumulate on the platform, and the two combined may have caused the injury. In such case the defendant's negligence might not have been the *sole* cause of the accident, but because it was a concurrent cause, the defendant would be liable. In other words, because there was enough basis in this case for the application of the doctrine of concurrent negligence, it was error to give the third instruction.

For these reasons the third instruction given for the defendant was erroneous, in so far only as it told the jury that the defendant was not liable unless its negligence *solely* caused the accident. For this error the judgment of the circuit court must be reversed and the cause remanded for further trial in conformity hereto. This conclusion makes it unnecessary to consider the other errors assigned, as they may not reoccur upon another trial, except to say, that there was no error in excluding evidence as to whether there was grease on the platform in March, 1897 (this accident occurred in August, 1897), and whether there was grease there two weeks after the accident. The first was too remote to afford a reasonable basis for an inference of the condition on the day of the accident, and the second was too far after the accident to be admissible at all.

The same is true as to whether there were signs or placards upon the cars in March, 1897. Moreover, as the plaintiff in his instructions predicated a right to recover solely upon the ground that there was grease on the platform that caused the plaintiff to fall, the question of signs or placards on the cars is not material now.

The judgment of the circuit court is reversed and the cause remanded for a new trial. All concur.